**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**SEP 3 1999**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

## UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

    No. 98-2160

OLGA A. GOMEZ,

    Defendant-Appellant.

### APPEAL FROM THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW MEXICO
### (D.C. No. CR-97-263-LH)

Maria M. Laverde, Las Cruces, New Mexico, for Defendant-Appellant.

James R. W. Braun, Assistant United States Attorney (John J. Kelly, United States Attorney with him on the brief), Las Cruces, New Mexico, for Plaintiff-Appellee.

Before **KELLY**, **MCKAY** and **HENRY**, Circuit Judges.

**HENRY**, Circuit Judge.

    Ms. Olga A. Gomez appeals her criminal convictions for possession with intent to distribute 50 kilograms or more of marijuana, in violation of 21 U.S.C. § 841, and conspiracy to possess with intent to distribute 50 kilograms or more of marijuana, in

violation of 21 U.S.C. § 846.  She argues that the trial court (1) erred in failing to grant her motion to dismiss based on the United States' destruction of the marijuana evidence and (2) violated the Confrontation Clause by admitting her absent codefendants' confessions.  She also raises a claim based on United States v. Singleton, 144 F.3d 1343 (10th Cir. 1998), ordered reheard en banc and opinion vacated, July 10, 1998, id. at 1361-62 (order).  We exercise jurisdiction under  28 U.S.C. § 1291 and remand for a new trial.

## I.  Background

On April 4, 1997, Border Patrol Agent Martin observed two sets of headlights approaching from the east on Highway 9, west of Hachita, New Mexico and near the Mexican border.  Agent Martin became suspicious of the cars and stopped the first one, a sedan, which contained Ms. Gomez, Maria Teresa Rubio, and Jose de Jesus Yanez Torres.  He briefly questioned them regarding their destination.  In response to a question, Ms. Gomez stated they were not traveling with anyone else.

During that time, the second vehicle, a white truck, passed them.  Agent Martin released the sedan, then pursued and stopped the truck.  He noticed an unconnected propane tank in the truck.  The truck's driver, Felipe Bravo-Aguilar, agreed to follow Agent Martin to the border patrol station, where a drug-sniffing dog indicated the presence of narcotics in the tank.  Several agents then planned a controlled delivery of the truck, whereby Mr. Bravo-Aguilar agreed to continue to deliver the drugs as before while

2

the agents followed behind in an unmarked car.

As the agents followed Mr. Bravo-Aguilar, they again noticed the sedan, which engaged in a series of unusual driving maneuvers, repeatedly passing them and then making U-turns to fall in behind them again. The agents pulled the sedan over a second time. Ms. Gomez, Ms. Rubio, and Mr. Yanez Torres (then claiming to be Hector Rubio, Maria's brother) contradicted the earlier story they had told about their destination.

During a subsequent pat-down of Mr. Yanez Torres, Agent Cordova found a cellular phone in Mr. Yanez Torres' coat pocket. Agent Cordova pressed redial on the phone, and had a conversation about the load of marijuana with the person who answered. Agent Cordova told Mr. Yanez Torres this conversation linked him to the drugs. So confronted, Mr. Yanez Torres admitted he was involved with the drugs, but claimed his "sister," Ms. Rubio, was not. He provided a written statement. After seeing Mr. Yanez Torres' statement, Ms. Rubio also provided a written statement. Mr. Yanez Torres showed the agents how to access the drugs in the tank. The tank was found to contain approximately 130.5 pounds of marijuana worth, according to later testimony at trial, $104,400. See Rec. vol. IV, at 99-100.

The government charged Mr. Bravo-Aguilar (the truck driver) first, on April 16, 1997, with one count of possession with intent to distribute 50 kg or more of marijuana. The United States Customs Service gave the United States Attorney notice the same day that it would destroy the drug evidence 60 days from the date of notification, pursuant to

21 U.S.C. § 881(f)(2). Mr. Bravo-Aguilar also received notice of the destruction. See Rec. vol. I, doc. 43, at 2. Accordingly, the government destroyed the bulk of the drugs on June 3, 1997 (but retained nearly one kilogram of samples). On the day following the marijuana destruction, June 4, Ms. Gomez was charged along with codefendants Mr. Bravo-Aguilar, Ms. Rubio, and Mr. Yanez Torres by superseding indictment with one count of possession with intent to distribute 50 kilograms or more of marijuana and one count of conspiracy to do the same. Ms. Gomez was arrested on September 25 and arraigned on October 20. She did not receive notice of the drugs' destruction until October 29.

Ms. Gomez was tried separately in December, 1997. Mr. Bravo-Aguilar testified against her pursuant to a plea agreement with the government. The government also introduced written statements of confession from the other two codefendants, Mr. Yanez Torres and Ms. Rubio, who were unavailable to testify as they remained fugitives at the time of trial. A jury convicted Ms. Gomez on both counts. At the May 1998 sentencing hearing, the trial court sentenced Ms. Gomez to 41 months on each count, to run concurrently, followed by three years supervised release on each count, to run concurrently.

## II. Discussion

### A. Right to a Fair Trial

Ms. Gomez argues that the government violated her right to a fair trial by its

4

destruction of the marijuana upon which her conviction was based. She locates her claim on two distinct grounds: (1) Fed. R. Crim. P. 16 and the district court's standing discovery order, and (2) her Fifth Amendment right to due process and the standards articulated in <u>Brady v. Maryland</u>, 373 U.S. 83 (1963). We find her arguments on the fair trial issues to be without merit.

*1. Fed. R. Crim. P. 16/Standing Discovery Order Violation*

Ms. Gomez argues that the government's destruction of the drug evidence violated Fed. R. Crim. Pro. 16(a)(1)(C) and the court's standing discovery order. <u>See</u> Order, Rec. vol I, doc. 33, at 3. The court's discovery order explicitly tracks the language of Rule 16(a)(1)(C); accordingly we treat the two together. Both allow discovery of tangible objects "which are within the possession, custody or control of the government, and which are material to the preparation of the defendant's defense or are intended for use by the government as evidence in chief at the trial, or were obtained from or belong to the defendant." Fed. R. Crim. P. 16(a)(1)(C); Order at 2.

The bulk of the drug evidence was destroyed on June 3, 1994. However, Ms. Gomez was not indicted until June 4, 1994, and the district court did not issue its discovery order until October 20, 1994. Thus, by the time the requirements of Fed. R. Crim. P. 16 and the court's order became applicable to Ms. Gomez, the government was no longer in "possession, custody, or control of" the bulk of the drug evidence. Accordingly, its failure to produce the evidence was not a violation of either the Rule or

5

the Order. The issue Ms. Gomez raises is not a discovery violation, but rather, is whether the government's destruction of the evidence without prior notice to her violated her due process rights, as discussed below.

*2. Due process/<u>Brady</u> claim*

We turn to Ms. Gomez's argument that the government's destruction of the marijuana evidence without prior notice to her violates her due process rights. She characterizes her claim both as a failure to disclose material, exculpatory evidence under the standards articulated in <u>Brady v. Maryland</u>, and as a bad faith failure to preserve evidence that could have been potentially useful to her defense.

First, we do not believe her claim is properly characterized as a <u>Brady</u> claim. As we have previously stated, "[t]he Supreme Court's jurisprudence divides cases involving nondisclosure of evidence into two distinct universes. <u>Brady</u> and its progeny address exculpatory evidence still in the government's possession. [<u>Arizona v. Youngblood</u>, 488 U.S. 51, 58 (1988))] and [<u>California v. Trombetta</u>, 467 U.S. 479 (1984)] govern cases in which the government no longer possesses the disputed evidence." <u>Fero v. Kerby</u>, 39 F.3d 1462, 1472 (10th Cir. 1994) (quoting <u>United States v. Femia</u>, 9 F.3d 990, 993 (1st Cir. 1993)). Here, the government admits that the evidence was no longer in its possession. Therefore, Ms. Gomez's claim is more properly treated under the <u>Youngblood</u>/<u>Trombetta</u> line of cases.

In order to establish a due process violation under <u>Trombetta</u>, Ms. Gomez must

6

show that the marijuana evidence had exculpatory significance that would have been "apparent before" its destruction, and that it was "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." See Trombetta, 467 U.S. at 488. She has failed to show that its exculpatory significance would have been apparent. Instead, as the district court properly determined, Ms. Gomez has established only that the evidence was "potentially useful" to her defense. See Rec. vol. II, at 17. In order to establish a due process violation with respect to "potentially useful" evidence, Ms. Gomez must show that the government acted in bad faith in destroying it. See United States v. Bohl, 25 F.3d 904, 910 (10th Cir. 1994) (citing Youngblood, 488 U.S. at 58). Here, the district court concluded that the government did not act in bad faith. We review that conclusion for clear error. See United States v. Parker, 72 F.3d 1444, 1450 (10th Cir. 1995).

Ms. Gomez argues that because the government knew on April 4, 1997 that it would seek a later indictment against her, its failure to provide her notice before destroying the drugs shows its bad faith. As support for her argument that the government knew it would seek a later indictment, she refers to a United States Attorney's duty report from the date of her initial detention. She characterizes that report as showing that she had been affiliated with the load and had been released with the intention of indicting at a later date. The district court accepted this characterization as accurate, see Rec. vol. II, at 8-9, but declined to find that it established bad faith. See id. at 17.

7

We do not find the existence of such a report sufficient to show the district court's conclusion was clearly erroneous. As the government pointed out, it destroyed the marijuana pursuant to its ordinary statutory procedures, before Ms. Gomez had even been indicted. See 21 U.S.C. § 881(f)(2), 19 C.F.R. § 162.45a (Treasury Reg.); 28 C.F.R. § 50.21 (Department of Justice Reg.). That is, the first indicted co-defendant, Mr. Bravo-Aguilar, was indicted on April 4, 1997. That same day, the Drug Enforcement Administration (DEA) gave the United States Attorney notice that, pursuant to 21 U.S.C. § 881(f)(2), it would destroy the drug evidence 60 days from the date of notification (as required by 28 C.F.R. § 50.21). Accordingly, on June 3, 1997, the DEA destroyed the bulk of the drugs. Ms. Gomez was not indicted by superseding indictment until the next day, June 4, 1997, after the marijuana had already been destroyed and it was no longer possible to give her prior notice. Although the government points out that it retained nearly one kilogram of samples, as required by 28 C.F.R. § 50.21(e)(4), this does not address Ms. Gomez's primary concern, which was with the total weight of the marijuana as it related to her sentencing.

Surprisingly, we have found no statutory or regulatory requirement – nor have the parties provided us any – that defendants or potential defendants, against whom the soon-to-be-destroyed evidence is to be used, be given notice of the destruction. Ms. Gomez points to 21 U.S.C. § 883, which instructs the DEA to give notice to the possessor of seized contraband and an opportunity for a hearing prior to reporting the criminal

8

violation to a United States Attorney. That scenario, however, is not raised in this case.

The established procedure seems not to require notice, and in most cases, "destruction of evidence in accordance with an established procedure precludes a finding of bad faith absent other compelling evidence." United States v. Deaner, 1 F.3d 192, 202 (3d Cir. 1993). There is no such evidence here – the United States Attorney's duty report does not rise to that level. The government should consider modifying its drug destruction procedures to avoid such issues of timing in the future. Nevertheless, in the absence of more compelling evidence, we find no bad faith, and thus no due process violation.

*B. Confrontation Clause Violation*

Ms. Gomez also argues that the district court violated her Sixth Amendment Confrontation Clause rights by admitting the confessions of her absent codefendants, Mr. Yanez Torres and Ms. Rubio. Both codefendants had made their statements while being detained at the New Mexico State Police Office, where they had been transported after their initial detention. During his interview with the state police officer, Mr. Yanez Torres had agreed to the officer's request that he make a written statement. He stated:

> I got to Columbus – I got to Columbus today, Friday, and the load was at the house. Then we unloaded the tank, the driver and I, and we started to load the marijuana into the tank. Then we covered it up. From there, the truck came through Hachita. The driver was going to take it to the McDonald's in Lordsburg. There, Senora Olga [Ms. Gomez] was going to get on and drive the truck. We were waiting for the truck and it didn't arrive, when we saw it on the road to Silver

9

City, and we followed it to Silver City, and there we were stopped.

Rec. vol. IV, at 234-35. After reviewing Mr. Yanez Torres' statement, Ms. Rubio also agreed to make a written statement. She stated (also misstating Mr. Yanez Torres' identity):

> Hector [Mr. Yanez Torres] was sent with the truck to a house unknown to me to put the load in the tank. Afterward, they told me to bring them to Lordsburg and that we [Mr. Yanez Torres, Ms. Gomez, and Ms. Rubio] were going to wait for the truck there. Since the truck didn't get there, we came towards Silver City and halfway we came back, and when we came back we saw the truck on the road, and we turned around to follow it, and there was when we were stopped by the police.

Id. at 238-39. Neither Mr. Yanez Torres nor Ms. Rubio testified in person at Ms. Gomez's trial as they remained fugitives.

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." Lilly v. Virginia, 119 S. Ct. 1887, 1894 (1999) (plurality) (quoting Maryland v. Craig, 497 U.S. 836, 845 (1990)). In cases such as this, where the declarants remain unavailable at trial and the government seeks to offer their out-of-court statements against the accused, "courts must decide whether the Clause permits the government to deny the accused his usual right to force the declarant to submit to cross-examination." Id. at 1893.

The Clause may permit the government to deny the accused the right to cross-

10

examination if the court deems the proffered out-of-court statements to be "so trustworthy that adversarial testing can be expected to add little to [the statements'] reliability." White v. Illinois, 502 U.S. 346, 357 (1992). That is, the right to confrontation is not absolute, and "does not necessarily prohibit the admission of hearsay statements against a criminal defendant." Idaho v. Wright, 497 U.S. 805, 813 (1990). Hearsay statements are deemed sufficiently reliable to allow their admission without the benefit of cross-examination when the statements (1) "fall[] within a firmly rooted hearsay exception," or (2) contain "adequate indicia of reliability." Ohio v. Roberts, 448 U.S. 56, 66 (1980).

Thus, we consider whether these statements are admissible under either of the Roberts exceptions. First, we consider whether they fall within a firmly rooted hearsay exception. We hold they do not based on Supreme Court precedent in Lee v. Illinois, 476 U.S. 530 (1986), Williamson v. United States, 512 U.S. 594 (1994), and Lilly v. Virginia, 119 S. Ct. 1887 (1999), as well as Tenth Circuit precedent, particularly Earnest v. Dorsey, 87 F.3d 1123 (10th Cir. 1996). Second, we consider whether the statements are nevertheless admissible because they exhibit sufficient indicia of reliability. We conclude they do not, and hold their admission violated Ms. Gomez's Confrontation Clause rights. Third, applying the constitutional harmless error test, we conclude the error was not harmless beyond a reasonable doubt.

## 1. Firmly rooted hearsay exception

First, we consider the government's contention that the statements at issue fall

11

within a firmly rooted hearsay exception as statements against penal interest, admissible under Fed. R. Evid. 804(b)(3). The Supreme Court has previously observed that this hearsay exception "defines too large a class for meaningful Confrontation Clause analysis." Lee, 476 U.S. at 544 n.5. But the government contends that the Supreme Court addressed these concerns in Williamson, 512 U.S. 594, by defining the class of statements against penal interest very narrowly to include only those parts of statements that are truly self-inculpatory. It argues the Williamson Court implied that as long as a statement fits within this narrower rule, it satisfies Confrontation Clause analysis.

Following the most recent guidance of the Supreme Court, however, we decline to adopt that conclusion with respect to these statements. In Lilly, 119 S. Ct. 1887, an opinion issued during the pendency of this appeal, the Supreme Court explicitly considered the use of statements against penal interest offered by the prosecution in the absence of the declarant to incriminate a criminal codefendant. Five members of the Court held that such statements do not categorically satisfy Confrontation Clause concerns. See id. at 1899, 1903.

Justice Scalia, concurring separately, took the most resolute stance against the use of such statements, calling it "a paradigmatic Confrontation Clause violation." Id. at 1903. The four-member plurality took a more nuanced approach. It divided the category of statements against penal interest into three subcategories: (1) those used as voluntary admissions against the declarant; (2) those used as exculpatory evidence offered by a

12

defendant who claims that the declarant committed, or was involved in, the offense; and (3) those used as evidence offered by the prosecution to establish the guilt of an alleged accomplice of the declarant. Id. at 1895-97. The plurality recognized that statements in this last category — like those at issue here — do not fall into a firmly rooted hearsay exception. Id. at 1899.

In so doing, the plurality observed that the Court had "over the years 'spoken with one voice in declaring presumptively unreliable accomplices' confessions that incriminate defendants.'" Id. at 1897 (quoting Lee, 476 U.S. at 541). It reaffirmed the Court's prior recognition that:

> th[e] truthfinding function of the Confrontation Clause is uniquely threatened when an accomplice's confession is sought to be introduced against a criminal defendant without the benefit of cross-examination . . . . Due to his strong motivation to implicate the defendant and to exonerate himself, a codefendant's statements about what the defendant said or did are less credible than ordinary hearsay evidence.

Id. at 1898.

Three concurring justices refused such a broad holding, reserving the possibility that "a genuinely self-inculpatory statement that also inculpates a codefendant" might nevertheless satisfy a firmly rooted hearsay exception. Id. at 1904. But, they also appeared to distinguish between "genuinely self-inculpatory statement[s]" and statements given as "part of a custodial confession of the sort that this Court has viewed with 'special suspicion' given a codefendant's 'strong motivation to implicate the defendant and to exonerate himself.'" Id. at 1904. The statements at issue here – given while the

13

codefendants were detained at the police station – fall into this latter category. Hence, declining to venture forth where the Supreme Court itself has thus far refused to tread, we hold these statements do not fall within a firmly rooted hearsay exception.

We note the government's argument that Ms. Rubio's statement should not even be subject to Lee scrutiny because it does not mention Ms. Gomez by name. We reject that argument. Ms. Rubio's entire statement is phrased in terms of "we," which, in conjunction with the other evidence presented at trial, would have been clearly understood to include Ms. Gomez. Thus, we proceed to consider whether the contested statements nevertheless meet the second Roberts exception.

## 2. Sufficient Indicia of Reliability

Under the second Roberts exception, we consider whether the statements exhibit "adequate indicia of reliability" to justify their admission. See Roberts, 448 U.S. at 66. In evaluating the reliability of the hearsay statements, we presume that the factual findings of the district court are correct; but whether the hearsay statements are reliable is a mixed question of law and fact reviewed de novo. See Crespin v. New Mexico, 144 F.3d 641, 647 (10th Cir. 1998). This standard of review is consistent with the recent Lilly decision. There, the concurring justices disputed whether the Supreme Court of Virginia had passed on the question of indicia of reliability in the first place. By contrast here, there is no dispute that the lower court, in reliance on our prior precedent, ruled that the statements had "sufficient indicia of truthfulness." Rec. vol. IV, at 228. While the lower

14

court here did not make a detailed explanation of its reliability ruling, it had requested briefing on the issue and had all of the parties' arguments before it. As we are in an equal position with the lower court to evaluate the merits of those legal arguments, we conduct a de novo review.

We begin with the repeated observation that this type of statement has consistently been deemed "presumptively unreliable." See Lilly, 119 S. Ct. at 1897 (citing Lee, 476 U.S. at 541). While the Supreme Court has clearly stated that "the presumption of unreliability that attaches to codefendants' confessions . . . may be rebutted," Lee, 476 U.S. at 543, the more recent Lilly plurality cautions us that "[i]t is highly unlikely that the presumptive unreliability that attaches to accomplices' confessions that shift or spread blame can be effectively rebutted when the statements are given under conditions that implicate the core concerns of the old ex parte affidavit practice – that is, when the government is involved in the statements' production, and when the statements describe past events and have not been subjected to adversarial testing." Lilly, 119 S. Ct. at 1900.

Given the heavy weight of this presumption, we proceed to consider whether the circumstances surrounding these statements exhibit sufficient indicia of reliability to overcome the statements' "presumptive unreliability." We conclude they do not.

In making such determinations, courts inquire as to what indicia of reliability were present at the time the statements were made. See, e.g., id.; United States v. Gomez, 810 F.2d 947, 954 (10th Cir. 1987). Here, the government points to various factors it suggests

15

support a finding of reliability, based on our prior cases. These include: (1) the statements were sufficiently detailed that they would have been difficult to fabricate; (2) there is no evidence the statements were coerced; (3) both Mr. Yanez Torres and Ms. Rubio were in a position to have had personal knowledge of the disputed events; (4) the statements were made soon after the events occurred, so it is unlikely their recollection would have been faulty; and (5) there was no evidence presented as to a reason for retaliation against Ms. Gomez.

As a preliminary matter, we disagree with some of their assertions. For example, we do not believe these brief one paragraph statements are of such detail that they would have been difficult to fabricate. Nevertheless, we do agree that, speaking generally, these factors have in the past supported a finding of reliability.

But, it is equally important to note that here, we *lack* several important indicia of reliability. First, we have previously held that the absence of an offer of leniency and a codefendant's low degree of agitation are important indicators of reliability. See Earnest, 87 F.3d at 1132-34 (upholding reliability determination, considering factors including "that [defendant] was offered no leniency in exchange for his statement" and "that [defendant] was not unduly agitated when he made the statement"). In the instant case, the record shows the detaining officer told both codefendants their cooperation would be beneficial. See Rec. vol. IV, at 246. Further, he described both codefendants as having "appeared nervous" and having been "a little bit more" agitated than normal. See Rec.

16

vol. IV, at 223. Thus, both of these indicia militate against a finding of reliability. Further, Ms. Rubio did not give her statement until after having reviewed that of Mr. Yanez Torres. Not only does this "weigh[] against a finding that her statement is reliable," as the government admitted in its brief, see Aple. Br. at 30, this most seriously compounds our doubts as to its reliability. Finally, Mr. Yanez Torres had been falsely passing himself off at the time of his detention as Hector Rubio, Ms. Rubio's "brother." His true identity was not discovered until after Ms. Gomez's trial. This deception – maintained throughout the police interview during which he gave the statement – similarly reinforces our doubts about his statement's reliability.

Significantly, in none of our cases has the presence of certain indicia of reliability supported a finding of reliability when there were such simultaneously strong indicators of unreliability – the lack of these other important indicia. Even in those cases in which the affirmative factors played an important role in establishing reliability, such as Earnest, we relied most heavily on the fact that the statements were strongly against the declarant's penal interest. See Earnest, 87 F.3d at 1133-34. Of course, the government urges us to consider this factor here also. It is doubtful that we would accept this argument – the statements spread blame equally at best. However, even were we to partially accept their argument, after the Supreme Court's decision in Lilly, it is no longer clear whether considering the degree to which a statement is against penal interest is even permissible: this factor "merely restates the fact that portions of his statements were technically against

17

penal interest." Id. "[S]uch statements [against penal interest] are suspect insofar as they inculpate other persons. '[T]hat a person is making a broadly self-inculpatory confession does not make more credible the confession's non-self-inculpatory parts.'" Id. (quoting Williamson, 512 U.S. at 599).

Accordingly, the government has failed to overcome the initial presumption of unreliability attached to these codefendants' confessions that shift or spread blame. Therefore, we hold that admission of both statements violated Ms. Gomez's Confrontation Clause rights.

## 3. Harmless Error

Nevertheless, Confrontation Clause violations are subject to the constitutional harmless error standard. See United States v. Joe, 8 F.3d 1488, 1497 (10th Cir. 1993). Accordingly, we will uphold Ms. Gomez's conviction only if we conclude the error was "'harmless beyond a reasonable doubt.'" Id. (quoting Chapman v. California, 386 U.S. 18, 24 (1967)).

Based on a careful review of the record, we do not find the error harmless beyond a reasonable doubt. Apart from the codefendants' statements, the only independent corroborating evidence establishing that Ms. Gomez was cognizant of the drug transport – essential to both drug charges – was the testimony of Mr. Bravo-Aguilar, a witness testifying pursuant to a plea agreement. Mr. Bravo-Aguilar also provided the only other corroboration that Ms. Gomez was present when Mr. Yanez Torres and Mr. Bravo-

18

Aguilar loaded the drugs into the propane tank.

This is particularly troubling when we note, for example, that there were inconsistencies between Mr. Bravo-Aguilar's testimony at trial and Mr. Yanez Torres' statement as to whether Ms. Gomez was present when the drugs were loaded. While Mr. Yanez Torres' statement read: "we unloaded the tank, the driver and I, and we started to load the marijuana into the tank," Mr. Bravo-Aguilar testified that Ms. Gomez helped them load the truck. See Rec. vol. IV, at 203. The government then had the opportunity to ask Mr. Bravo-Aguilar about the truth of Mr. Yanez-Torres' statement: "if [Mr. Yanez Torres] made a statement that said just the two of you loaded the truck, was he lying?" to which Mr. Bravo-Aguilar responded, "Yes." Id. Ms. Gomez did not have an equal opportunity to demand the same of the absent Mr. Yanez Torres. This is exactly the sort of concern that the right to cross-examination protects. The lack of some similar reassurance here is exactly why we remain so troubled in this case.

Certainly, there was independent testimony that Ms. Gomez was driving at the time the car made suspicious driving maneuvers consistent with a scout/load car scenario, and that Ms. Gomez had previously received some funds from "Hector Rubio." However, Ms. Gomez consistently maintained her innocence of the scheme, asserting that Ms. Rubio had suggested that she make the turns and concocted a story to convince her to take Mr. Yanez Torres along. Without the codefendants' testimony, the story is reduced to a credibility contest between Mr. Bravo-Aguilar and Ms. Gomez.

19

Admittedly, Ms. Gomez might have nevertheless lost this credibility battle, particularly when her testimony appears to have had other inconsistencies. Yet, when the government's evidence also suffered from inconsistencies, Ms. Gomez's knowledge of the drug transport was essential to the charges, and there lacked other independent corroborating evidence, we cannot say that admission of the improper hearsay evidence was harmless error. Accordingly, we must remand for a new trial.

*C. Singleton claim*

Ms. Gomez also argues on appeal that the prosecutor violated 18 U.S.C. § 201(c)(2) by entering into a plea agreement with a cooperating defendant. Ms. Gomez did not argue this below, and in any event, an en banc decision of this court resolved the issue against her position in United States v. Singleton, 165 F.3d 1297 (10th Cir. 1999) (en banc). Her claim therefore fails.

## III. Conclusion

For the foregoing reasons, we VACATE the decision of the district court and REMAND for a new trial.