**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 24, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

## UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

LEEROY WENDELL MCQUEARY, II,
a/k/a Lee Roy Wendall McQueary, II, a/k/a
Leeroy McQueary, a/k/a Leeroy Wendal
McQueary,

    Defendant - Appellant.

No. 23-5087
(D.C. No. 4:22-CR-00417-KES-1)
(N.D. Okla.)

---

### ORDER AND JUDGMENT[*]

---

Before **MATHESON**, **KELLY**, and **MORITZ**, Circuit Judges.

---

A jury convicted Leeroy Wendell McQueary, II of two counts of assault with a

dangerous weapon with intent to do bodily harm in Indian country.  On appeal, he

challenges the district court's (1) denial of an adverse inference jury instruction based on

destroyed portions of surveillance video footage of the incident and (2) order that he pay

restitution to the hospital for damages to a security vehicle.

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel.  It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Exercising jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a), we affirm the district court's denial of the jury instruction and reverse its restitution order.

## I.     BACKGROUND

### A.  *Factual Background*[1]

#### 1.  The Incident

On November 4, 2022, Mr. McQueary entered Saint Francis Hospital ("St. Francis") in Tulsa, Oklahoma to visit a hospitalized friend.  Two front desk workers tried to assist him but called hospital security after observing Mr. McQueary's incoherent and erratic behavior.  St. Francis Security Officer Kyle Warlick responded and escorted Mr. McQueary out of the building to his car in the parking lot.  Mr. McQueary swore at him on the way to the parking lot.

While walking, S.O. Warlick called for backup.  Security Officer Mark Young responded in a St. Francis security vehicle, pulling up behind Mr. McQueary's vehicle as he stood next to it with the door open.  At S.O. Warlick's direction, S.O. Young repositioned the security vehicle to leave space for Mr. McQueary to exit.  Security Officer Rodger Wall then arrived on foot.

Mr. McQueary yelled insults and threats at the security officers before getting into his vehicle and again through his passenger-side window after backing out of his parking spot.  He then accelerated forward and sideswiped S.O. Young's vehicle.  S.O. Wall and S.O Warlick ran to the adjacent lane of the parking lot to protect any pedestrians from

---

[1] We draw this factual history from the trial evidence.

Mr. McQueary on his way to the exit. Mr. McQueary rounded the corner into the lane where they stood, accelerated, and steered towards them in an apparent attempt to hit them. The security officers drew and fired their firearms at Mr. McQueary's vehicle because they feared for their lives. Mr. McQueary's vehicle missed both men and sped out of the parking lot exit.

### 2. **The Surveillance Video**

St. Francis has a surveillance network of over 800 cameras. The system produces a video with a timestamp, but no audio.

Shortly after the incident on November 4, Tulsa Police Department ("TPD") Officers Nhia Yang and Brandon Slater arrived at St. Francis. The officers' body camera footage showed them gathering witness statements and reviewing surveillance footage of the incident with S.O. Wall—one of the assault victims. Officer Yang asked for a copy of the recording, but St. Francis Security Manager Matthew Hart denied the request, stating that St. Francis's general counsel must approve release of any videos.

St. Francis captured the portions of the surveillance footage it deemed relevant without input from TPD. With its general counsel's approval, St. Francis released three clips to TPD and Special Agent Ben Nechiporenko of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), who assisted in the investigation. The three clips show:

- St. Francis's lobby, beginning when Mr. McQueary entered and ending when Security Officer Warlick escorted him out.

- A wide view of the parking lot, beginning after Mr. McQueary got into his vehicle and ending after he departed the parking lot.

3

- A zoomed-in view of the parking lot, showing the moment Mr. McQueary's vehicle almost struck the security officers.

The released footage did not include approximately three minutes of video showing S.O. Warlick escorting Mr. McQueary to his vehicle and waiting for him to depart. The two videos of St. Francis's parking lot no longer had time stamps. Security Manager Hart explained that the software used to capture the video likely removed the time stamps.

Law enforcement, satisfied with the footage it received, requested no more. Under standard procedure, the St. Francis surveillance system automatically recorded over the footage of the incident 29 to 30 days later. No witness testified that law enforcement was aware of this practice.

## B. *Legal Background*

Mr. McQueary argues the district court's failure to instruct the jury on spoliation of surveillance evidence violated due process. To aid in understanding the district court proceedings on this issue, we provide a brief overview of the applicable law.

Two Supreme Court decisions, *California v. Trombetta*, 467 U.S. 479 (1984), and *Arizona v. Youngblood*, 488 U.S. 51 (1988), govern whether the destruction of evidence violates due process.

In *Trombetta*, the Court held that the government has a duty to preserve "evidence that might be expected to play a significant role in the suspect's defense." 467 U.S. at 488. Failure to preserve evidence violates due process if (1) the destruction of the evidence is attributable to the government, *id*. at 488-89; and (2) the evidence

"possess[ed] an exculpatory value that was apparent before [it] was destroyed,"
*id*. at 489.

In *Youngblood*, the Court extended *Trombetta* to provide that, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law."  488 U.S. at 58. "[M]ere negligence on the government's part in failing to preserve such evidence is inadequate for a showing of bad faith."  *United States v. Bohl*, 25 F.3d 904, 912 (10th Cir. 1994).  To determine whether the Government acted in bad faith under *Youngblood*, this court has considered factors identified in *Bohl*.

### C. *Procedural History*

#### 1. **Charges**

Mr. McQueary, an Indian, was charged by complaint with two counts of assault with a dangerous weapon with intent to do bodily harm in Indian country under 18 U.S.C. §§ 1151 and 113(a)(3).  A grand jury later indicted him for the same offenses, which are crimes under the Major Crimes Act, 28 U.S.C. § 1153(a).

#### 2. **Request for Additional Footage and Motion for Adverse Inference Jury Instruction**

Mr. McQueary's counsel was appointed on November 30, 2022—26 days after the incident. Aplt. Br. at 24.  On January 27, 2023, she requested the Government to provide "all camera footage from every angle in which this incident occurred for at least one hour prior to the incident and until the completion of any investigation contained on the

video." ROA, Vol. I at 32. The Government promptly requested the footage from St. Francis. St. Francis responded that it no longer had footage from November 4.

Mr. McQueary filed a pretrial motion for an adverse inference jury instruction based on spoliation of evidence. He argued that the Government destroyed or manipulated portions of surveillance video that had "apparent" exculpatory value, violating *California v. Trombetta*. *Id*. at 21. Alternatively, he argued that the missing footage was at least "potentially useful" and that it had been destroyed in bad faith, violating *Arizona v. Youngblood*. *Id*. at 22. Mr. McQueary requested a curative instruction that would inform the jury that "it may infer that unpreserved video evidence would have been unfavorable to the Government's theory of prosecution." *Id*. at 18.

The district court deferred its decision on the motion until the jury instruction conference after the trial evidence.

3. **Trial**

During trial, the prosecution called five eyewitnesses who testified regarding the incident at St. Francis—Security Officers Warlick, Wall, and Young—and two bystanders from the parking lot—Denver O'Neill and Alicia Case. It also called two St. Francis front desk workers—Marjorie Lawrence and Jacci Carpio—who had assisted Mr. McQueary and called hospital security. The prosecution introduced the three surveillance videos obtained from St. Francis. Officers Slater and Yang discussed the evidence they gathered. ATF Special Agent Nechiporenko testified about recorded calls between Mr. McQueary and his mother and the surveillance video evidence.

The defense called St. Francis's records custodian who confirmed Mr. McQueary's friend was admitted to St. Francis. The defense also called an expert accident reconstructionist, who testified about the sideswipe of St. Francis's security vehicle. He also approximated the distance between the security officers and Mr. McQueary's vehicle when they drew their firearms. An investigator from the public defender's office testified, reconstructing what Mr. McQueary would have seen as he drove through the parking lot. Mr. McQueary called St. Francis Security Manager Hart and Security Director Julie Harris to talk about St. Francis's surveillance system, the released footage, and the missing videos. Finally, he called TPD Officer Sergio Natividad, who stated that he found two bullet holes in Mr. McQueary's vehicle.

### 4. Jury Instruction Conference

At the jury instruction conference after the trial evidence, the district court denied Mr. McQueary's proposed instruction. It first found that the destruction was not attributable to the Government. ROA, Vol. III at 537 ("[T]here isn't any evidence that the Government destroyed this evidence."); *id*. at 538 ("Here it's actually the hospital . . . and not the Government that destroyed the evidence.").

Even assuming attribution, the district court found that Mr. McQueary had failed to show under *Trombetta* that the missing footage had "apparent exculpatory significance." *Id*. at 536-37. The court observed that the lost footage included (1) "a three-minute time span of video where [he] left the hospital, and he arrived at his car in the parking lot;" and (2) time stamps on the videos of the parking lot. *Id*. at 537. It found that Mr. McQueary "ha[dn't]" alleged that anything specific happened during those time

periods" and that "individuals involved with capturing the video testified that they believe that they had captured all of the relevant video footage." *Id*.

The district court next considered whether "the Government acted in bad faith in destroying [potentially useful] evidence" under *Youngblood*. *Id*. at 538. Using the *Bohl* factors, the court explained that the destruction of footage was done innocently in the ordinary course of business by St. Francis's automatic recopying procedure. *Id*. at 538-39. It also accepted the Government's innocent explanation for the lost time stamps that St. Francis's software was likely to blame. *Id*. at 539. The court concluded that, because the Government was not aware of any potential exculpatory value until "well after" the 30-day preservation period, even if it had destroyed the footage, it had not done so in bad faith. *Id*. at 538-39.

Based on its finding that the Government had not destroyed evidence in violation of Mr. McQueary's due process rights under *Trombetta-Youngblood*, the district court denied the motion for an adverse inference jury instruction.

5. **Conviction and Sentence**

The jury convicted Mr. McQueary of both assault counts. The district court sentenced him to 70 months in prison for each count, to run concurrently, followed by three years of supervised release. The court also ordered Mr. McQueary to pay $1,704.09 in restitution to St. Francis for damage to its security vehicle. Mr. McQueary timely appealed.

## II. **DISCUSSION**

On appeal, Mr. McQueary argues the district court (A) abused its discretion by denying his proposed adverse inference jury instruction and (B) plainly erred in awarding restitution to St. Francis for damage to its security vehicle.

### A. **Motion for Adverse Jury Instruction**

Mr. McQueary contends the district court clearly erred in finding that the Government did not violate his due process rights under *Trombetta* or *Youngblood*, and that failure to give his proposed instruction thus violated his right to a fair trial. We disagree.

### 1. *Standard of Review*

"A trial court's decision to give or refuse an adverse inference [jury] instruction is reviewed for an abuse of discretion." *Gilbert v. Cosco Inc.*, 989 F.2d 399, 406 (10th Cir. 1993); *accord Smith v. Nichols*, 506 F. App'x. 795, 799 (10th Cir. 1993) (unpublished). "In doing so, we accept the district court's factual findings unless they are clearly erroneous." *Burlington N. & Santa Fe Ry. Co. v. Grant*, 505 F.3d 1013, 1032 (10th Cir. 2007); *see also Moreno v. Taos Cnty. Bd. of Comm'rs*, 587 F. App'x. 442, 444 (10th Cir. 2014) (unpublished).[2]

"We review the district court's ruling on whether the [missing or destroyed] evidence bore apparent exculpatory value for clear error." *Johnson v. City of Cheyenne*,

---

[2] We cite unpublished cases as persuasive under Fed. R. App. P. 32.1(A) and 10th Cir. R. 32.1.

99 F.4th 1206, 1228 (10th Cir. 2024). We also review a court's finding that the government did not destroy evidence in bad faith for clear error. *Bohl*, 25 F.3d at 909 ("[B]ad faith presents a mixed question of fact and law in which 'the quintessential factual question of intent' predominates." (quoting *United States v. Richard*, 969 F.2d 849, 853 (10th Cir. 1992)). When reviewing for clear error, "we will not disturb a trial court's [finding] unless we have a definite and firm conviction that the trial court made a clear error of judgment." *United States v. Walker*, 85 F.4th 973, 979 (10th Cir. 2023).

### 2. *Analysis*

#### a. California v. Trombetta

We conclude that Mr. McQueary's *Trombetta* challenge fails because he has not shown the district court clearly erred in finding the evidence destruction was not attributable to the Government or that the missing surveillance evidence had "apparent" exculpatory value.

##### i. Attribution

A threshold *Trombetta-Youngblood* question is whether the Government was responsible for destruction of evidence. *Trombetta*, 467 U.S. at 488-89; *Youngblood*, 488 U.S. at 58. If not, there is no due process violation. *See Bullock v. Carver*, 297 F.3d 1036, 1056 (10th Cir. 2002). When a nongovernmental entity destroys evidence, the destruction may be attributed to the government only when the entity acted as the government's agent. *See, e.g.*, *United States v. Beckstead*, 500 F.3d 1154, 1158 n.3 (10th Cir. 2007); *Bullock*, 297 F.3d at 1055-57.

10

Mr. McQueary has not shown that St. Francis acted as a government agent. The TPD neither instructed nor advised St. Francis on "where to place cameras, how to record what the cameras detected, or how to preserve video recordings." *United States v. Fernandez*, 24 F.4th 1321, 1337 (10th Cir. 2022). St. Francis—not the police—recorded over the footage, following its standard procedure. The record lacks evidence that the Government was even aware of St. Francis's 30-day automatic destruction procedure until well after the footage had been destroyed. But even if evidence destruction could be attributed to the Government, we affirm on the next element of the *Trombetta* test.

ii. "Apparent" Exculpatory Value

Mr. McQueary argues that St. Francis destroyed (1) approximately three minutes of footage showing Mr. McQueary being escorted from St. Francis to his vehicle; (2) time stamps on the preserved clips of Mr. McQueary driving in the parking lot; and (3) "other potential footage" showing a different angle of Mr. McQueary driving in the parking lot. Aplt. Br. at 18.[3]

1) Escort footage

Mr. McQueary has not shown that footage of him being escorted to his vehicle had "apparent" exculpatory value. He argues it would have shown his peaceful compliance with S.O. Warlick, which would have "combat[ted] the guard's testimony that Mr. McQueary was acting in any way that justified the guard's actions." *Id*. at 21. But he

___

[3] The record does not establish whether unobstructed footage of a different angle ever existed. We assume that it did.

was not charged for his conduct in exiting the hospital, and calm compliance there would not exculpate him of attempting to hit the security officers with his car. Nor would such footage have rebutted the security officers' testimony that they drew their firearms primarily out of fear for their lives from an onrushing car. Further, because the video lacked audio, it would not have rebutted the security officers' testimony that Mr. McQueary verbally threatened and insulted them. Mr. McQueary has not shown it is likely that this footage would have been "expected to play a significant role in [his] defense." *Trombetta*, 467 U.S. at 488.

2) Time stamps

Mr. McQueary has not shown that time stamps missing from the parking lot footage had "apparent" exculpatory value. He argues they might be "probative" of his driving speed. Aplt. Br. at 19. But Mr. McQueary has not shown that speed estimates could not be made without time stamps. *Trombetta*, 467 U.S. at 490 (finding no violation where "respondents were [not] without alternative means of demonstrating their innocence."). And *Trombetta* demands more than showing that unpreserved evidence "might conceivably have contributed to [the] defense[]." *Id*. at 489. Mr. McQueary's argument also fails to account for the Government's evidence from five eyewitnesses testifying that he accelerated his vehicle toward the security officers. At best, the "chances are extremely low" that the time stamps would have been exculpatory, which does not satisfy *Trombetta*. *Id*.

### 3) Unobstructed footage

Mr. McQueary points to a physical obstruction depicted in the preserved footage that blocked the view of his vehicle turning towards the security officers. Aplt. Br. at 18. He insists that a different angle might have shown that the security officers drew their firearms before he had completed his turn, making them "the aggressors that day." *Id*. at 21. Mr. McQueary references St. Francis's surveillance network of over 800 cameras, arguing an unobstructed view must have been recorded. *Id*. at 18.

But even assuming such footage existed, Mr. McQueary fails to show that it had "apparent" exculpatory value. His hypothesis that the security officers drew their firearms before he rounded the corner defies the testimony of five eyewitnesses. ROA, Vol. III at 133-37 (Wall); 265-67 (Warlick); 308-09 (Young); 324-25 (O'Neill); 332-33 (Case). And the video presented at trial is consistent with the eyewitness testimony. It shows S.O. Warlick raising his firearm as Mr. McQueary's vehicle, having completed the turn, enters the frame. Mr. McQueary offers no more than a "conclusory argument that the lost [footage] might have contained exculpatory material," which fails the *Trombetta* standard. *Snow v. Sirmons*, 474 F.3d 693, 716 (10th Cir. 2007).

\* \* \* \*

Because Mr. McQueary fails to show that any missing surveillance footage was attributable to the Government or had "apparent" exculpatory value before it was destroyed, the district court did not clearly err in finding no *Trombetta* violation.

b.  Arizona v. Youngblood

Even if Mr. McQueary could make a plausible argument that the missing surveillance footage was at least "potentially useful" to his defense, there is no evidence the Government destroyed it in bad faith.  *Youngblood*, 488 U.S. at 58.  "[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law."  *Id*.  The district court therefore did not clearly err.

To determine whether the Government acted in bad faith under *Youngblood*, we consider the factors from *United States v. Bohl*.  We summarized those factors in *United States v. Smith* as whether:  (1) "the government had explicit notice" of the potential exculpatory value of the evidence; (2) "the claim that the evidence is potentially exculpatory is conclusory, or instead backed up with objective, independent evidence giving the government reason to believe that further tests of the [destroyed evidence] might lead to exculpatory evidence"; (3) "the government could control the disposition of the evidence [once the defendant] indicated that it might be exculpatory"; (4) "the evidence was central to the case"; and (5) "the government offers any innocent explanation for its disposal of the evidence."  534 F.3d 1211, 1224-25 (10th Cir. 2008) (citing *Bohl*, 25 F.3d at 911-13) (quotations omitted).  The *Bohl* factors support the district court's finding of no bad-faith evidence destruction.

On the first factor, Mr. McQueary has not shown the Government was on "explicit notice" that the missing or destroyed evidence had potential exculpatory value. *Id*. at 1224; *see Bohl*, 25 F.3d at 911-12.  The escort video preceded the incident, lacked

14

audio, and Officer Yang testified he saw nothing "pertinent" in it. ROA, Vol. III at 399-404. Mr. McQueary has not shown that estimates of his driving speed could not have been derived by timing the video itself. As for an unobstructed video of the parking lot, Security Manager Hart and S.O. Wall testified that they collected and produced all "relevant" footage. *Id*. at 185, 469, 473-74. Also, the preserved parking lot video, even with a partial obstruction, allowed a view of the incident that five eyewitnesses corroborated.

As to the second factor, Mr. McQueary has not offered "objective, independent evidence" that missing surveillance footage had potentially exculpatory value. *Bohl*, 25 F.3d at 911. As previously discussed, Mr. McQueary makes conclusory arguments that the footage would have rebutted the Government's five eyewitnesses.

On the third factor, once the defendant indicated certain evidence might be exculpatory, the Government could not control it because St. Francis's surveillance system had automatically recorded over it. *Id*. at 912. Mr. McQueary argues that his counsel had limited opportunity to request preservation of the footage before it was lost, but "bad faith necessarily turns on the Government's knowledge of the evidence's potentially exculpatory value." *Beckstead*, 500 F.3d at 1159 (citing *Youngblood*, 488 U.S. at 56 n.*).

The fourth factor also favors the Government. The unpreserved footage of Mr. McQueary being escorted to his vehicle was not "obviously critical to the prosecution" or central to the case. *Bohl*, 25 F.3d at 912. The Government's case focused on the assault.

Under the fifth factor, even assuming the missing time stamps and unobstructed parking lot footage may have helped Mr. McQueary's defense, St. Francis's routine disposal procedure provides an innocent explanation for their destruction, which "precludes a finding of bad faith absent other compelling evidence." *United States v. Gomez*, 191 F.3d 1214, 1219 (10th Cir. 1999); *accord Beckstead*, 500 F.3d at 1159.

Finally, even if the Government acted negligently by failing to ensure St. Francis preserved the footage, "mere negligence on the government's part in failing to preserve . . . evidence is inadequate for a showing of bad faith." *Bohl*, 25 F.3d at 912; *see also United States v. Gutierrez*, 415 F. App'x. 870, 875 (10th Cir. 2011) (unpublished) ("[F]ailure to use best practices in preserving evidence is not sufficient, by itself, to establish bad faith.").

The district court did not clearly err in finding there was no *Youngblood* violation. Even assuming the footage was potentially exculpatory, there is no evidence that it was destroyed in bad faith.

## B.  *Restitution Order*

The district court ordered restitution of $1,704.09 for damage Mr. McQueary caused to St. Francis's security vehicle.  We review for plain error because Mr. McQueary did not object to the restitution order.  *See* Fed. R. Crim. P. 52(b); *United States v. Wainwright*, 938 F.2d 1096, 1098 (10th Cir. 1991).  The parties agree the district court plainly erred.  Aplt. Br. at 29; Aplee. Br. at 35.  So do we.

"Courts have no inherent power to order restitution; they may only do so as authorized by statute." *United States v. Gordon*, 480 F.3d 1205, 1210 (10th Cir. 2007).

The Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663A(a)(1), authorizes the district court to award restitution to the "victim of the offense," for the "loss incurred by [the victim that] was a direct and proximate result of the offense for which [the defendant] was indicted and convicted." *United States v. Mendenhall*, 945 F.3d 1264, 1267 (10th Cir. 2019). Mr. McQueary was not convicted for striking St. Francis's security vehicle. Because damage to the security vehicle was not "caused by the conduct underlying the offense of conviction," *Mendenhall*, 945 F.3d at 1267 (quoting *Hughey v. United States*, 495 U.S. 411, 416 (1990) (quotations omitted)), the district court plainly erred in awarding restitution. *United States v. Smith*, 156 F.3d 1046, 1057 (10th Cir. 1998) (holding that an unlawful restitution order constitutes plain error).

## III. CONCLUSION

We affirm Mr. McQueary's conviction. We vacate the district court's restitution order and remand for further proceedings consistent with this order and judgment.

Entered for the Court


Scott M. Matheson, Jr.
Circuit Judge