**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 3, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

JESUS FRANCISCO FERNANDEZ,

    Defendant - Appellant.

No. 20-2106
(D.C. No. 1:17-CR-03237-JAP-1)
(D. N.M.)

_____

**ORDER**

_____

Before **TYMKOVICH**, Chief Judge, **HARTZ**, and **MORITZ**, Circuit Judges.

_____

This matter is before us on *Appellant's Petition for Panel Rehearing and Rehearing En Banc* ("Petition"). Upon careful consideration, we direct as follows.

Pursuant to Fed. R. App. P. 40, Appellant's request for panel rehearing is denied. However, we *sua sponte* amend our opinion as reflected in the attached revised opinion. The Clerk of Court shall replace our December 17, 2021 opinion with the attached revised opinion effective *nunc pro tunc* to the date the original opinion was filed.

The Petition and the attached revised opinion were transmitted to all judges of the court who are in regular active service. As no member of the panel and no judge in

regular active service requested that the court be polled, Appellant's request for rehearing *en banc* is denied. *See* Fed. R. App. P. 35(f).

Entered for the Court,

CHRISTOPHER M. WOLPERT, Clerk

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 17, 2021**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

JESUS FRANCISCO FERNANDEZ,

    Defendant - Appellant.

No. 20-2106

_____

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. 1:17-CR-03237-JAP-1)**

_____

Esperanza S. Lujan, Federal Public Defender's Office, Albuquerque, NM, for Defendant
- Appellant.

Emil John Kiehne, Office of the United States Attorney, District of New Mexico,
Albuquerque, NM, for Plaintiff - Appellee.

_____

Before **TYMKOVICH**, Chief Judge, **HARTZ**, and **MORITZ**, Circuit Judges.

_____

**HARTZ**, Circuit Judge.

_____

A jury convicted Jesus Francisco Fernandez of possession of

methamphetamine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1). The

methamphetamine was discovered during a search at the Albuquerque Greyhound bus

terminal of luggage on a bus on which Mr. Fernandez was a passenger. On appeal

Mr. Fernandez argues (1) that his conviction was not supported by sufficient evidence that the luggage was his, (2) that the search of the luggage by law-enforcement officers violated his Fourth Amendment rights, and (3) that he was denied due process by Greyhound's failure to record or preserve terminal surveillance video, allegedly as the agent of law-enforcement officers. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I. BACKGROUND

Greyhound buses arriving at the Albuquerque terminal often stop for a layover. Passengers disembark so that the bus may be cleaned and refueled in a separate wash-bay and maintenance area. During such layovers Jarrell Perry, a special agent for the United States Drug Enforcement Administration (DEA), regularly conducts what he calls "checking the bus." R., Vol. IV at 1082. He looks at luggage on the bus for signs of drug trafficking after the bus has been serviced and before the passengers reboard. Examining luggage may include looking for nametags (a lack of which raises suspicion), lifting bags to gauge weight, and smelling bags for substances often used to mask the scent of drugs (such as dryer sheets, perfume, mustard, or coffee). He then speaks to passengers after they reboard, looking for suspicious behavior. Once he checks the bus, Agent Perry talks to passengers who had originally been on the bus but are now waiting inside the terminal for the bus to which they will transfer.

Agent Perry encountered Mr. Fernandez on two layovers in late October 2017. On the first occasion, on October 22, he did not discover any criminal activity. Mr.

2

Fernandez had arrived on a bus from Phoenix and was standing inside the terminal awaiting the bus from El Paso that would be taking him north. He was wearing what Agent Perry described as a distinctive black hat bearing some sort of logo referencing New York. He had a black duffel bag at his feet. Agent Perry walked up to Mr. Fernandez and identified himself as a DEA agent. Mr. Fernandez agreed to speak with him. Agent Perry reviewed Mr. Fernandez's bus ticket, which was issued to a "Frank Dreke" and showed that he was traveling to Colorado Springs. R., Vol. IV at 1082–83. Agent Perry asked for identification. Mr. Fernandez retrieved a stack of papers from the black duffel bag and gave the papers to the agent. The documents, apparently medical-discharge paperwork from a Colorado hospital, bore the name "Jesus F. Fernandez-Rodriguez." *Id.* at 1083. Mr. Fernandez consented to a pat-down search of his person and a search of the bag; neither turned up contraband. Agent Perry thanked Mr. Fernandez and went on to speak with other travelers.

Three days later, Agent Perry was again on duty at the bus station, joined this time by DEA special agent Kirk Lemmon. A Greyhound bus arrived that morning for a layover of about 75 minutes. The passengers got off, and the bus was cleaned and refueled. After the bus pulled out of the wash bay, but before the passengers returned, the agents boarded the bus and began examining the luggage stored inside. Agent Perry noticed a large black duffel bag in the overhead compartment near the rear on the driver's side of the bus. The bag was "drooping," *id.* at 1058, because it was not filled to capacity. But when he lifted the bag, it felt "very, very heavy." *Id.* It had no name tag. He surmised that the bag contained illegal narcotics. He passed the bag to

3

Agent Lemmon to show him what he had observed and then returned the bag to the overhead compartment. Altogether, this interaction with the bag lasted about 30 seconds. Agent Perry told Agent Lemmon that he wanted to find out who owned the bag. The officers then left the bus and it was driven to the boarding area.

The officers reboarded the bus as the passengers began to get on. As the passengers were taking their seats, Agent Perry approached each of them, identified himself as a law-enforcement officer, asked about travel plans and luggage, and sometimes asked to search the passenger's belongings. Agent Lemmon stood behind the bus driver's seat to observe passengers and ensure Agent Perry's safety. A digital audio device on a lanyard under Agent Perry's shirt recorded all his interactions with the passengers. A video camera at the terminal also recorded a view from outside the bus, showing Agent Perry's movements down the aisle.

According to Agent Lemmon, when Mr. Fernandez boarded and saw Agent Lemmon, he "gave a face of surprise, almost panic." R., Vol. IV at 1249. Mr. Fernandez sat down near the middle of the bus. He intermittently peered over his shoulder and appeared to be observing Agent Perry's conversations with other passengers. Soon, Mr. Fernandez left his seat and entered the lavatory at the back of the bus. About a minute later, he opened the lavatory door, peeked out to see Agent Perry talking to another passenger close by, and closed the door again. Another minute later, Mr. Fernandez exited the lavatory and returned to his seat near the middle of the bus. He continued looking over his shoulder every so often toward Agent Perry.

4

Agent Perry approached Mr. Fernandez, displayed his DEA badge, and asked for permission to talk. Mr. Fernandez responded, "Again?" and laughed before agreeing to talk. *Id.* at 1078. Unprompted, Mr. Fernandez gave Agent Perry his bus ticket, which again bore the name "Frank Dreke." *Id.* at 1081. Upon seeing the name, Agent Perry recognized Mr. Fernandez from their encounter three days earlier. He asked whether they had spoken before, and Mr. Fernandez confirmed that they had. Agent Perry asked if he had luggage with him; Mr. Fernandez answered, "I don't got nothing with me today." Suppl. R., Vol. I at 46. Agent Perry repeated his question; again, Mr. Fernandez denied having luggage. Agent Perry then asked if he had any luggage on the previous trip; Mr. Fernandez responded, "Nah, I leave it at house— short trip." *Id.* Agent Perry said, "Ok, so you don't have any luggage." *Id.* Mr. Fernandez said, "Nah." *Id.* Mr. Fernandez consented to a pat-down search, which turned up nothing. Agent Perry said, "I thought you had a bag the other day though?" *Id.* Mr. Fernandez confirmed that he had a black or brown bag on the previous trip. Agent Perry thanked him and proceeded to speak with the other passengers.

No passenger claimed the black duffel bag that had piqued the agents' interest. Eventually, Agent Perry grabbed the black duffel bag and, starting from the rear of the bus, carried the bag up the aisle, asking each passenger about the bag. Once he reached Mr. Fernandez, the agent asked if the bag was his. Mr. Fernandez replied, "Yeah, that's my bag," and asked, "You want to check it out?" R., Vol. IV at 1091. Agent Perry asked for and received permission to search the bag. He placed it in the vacant seat in front of Mr. Fernandez, opened it, and discovered an oblong bundle

5

wrapped in brown tape, which he recognized as consistent with the packaging of illegal drugs. Agent Perry arrested Mr. Fernandez. As he was being arrested, Mr. Fernandez said, unprompted, "That's not my bag, that's not my bag." Suppl. R., Vol. I at 52.

A grand jury indicted Mr. Fernandez on one count of possession of methamphetamine with intent to distribute. He moved to suppress evidence from the bag on the ground that Agent Perry had unlawfully seized and searched the bag. To support the suppression motion, he subpoenaed all recordings from Greyhound surveillance cameras at the terminal for the relevant time period on October 25. But he was informed that there was no video available from several of the cameras. He moved to hold the government responsible for destruction of the video-surveillance footage on the ground that Greyhound was acting as a government agent with respect to its handling of the surveillance cameras and video recordings. The district court conducted evidentiary hearings on both the agency issue and the motion to suppress. It ruled that Greyhound was not acting as an agent of the government and denied the motion to suppress.

Mr. Fernandez was then tried twice. The first jury could not reach a verdict, and the district court declared a mistrial. But the second jury found Mr. Fernandez guilty. The district court sentenced Mr. Fernandez to 180 months' imprisonment.

## II.   DISCUSSION

On appeal Mr. Fernandez challenges his conviction on three grounds: (1) there was insufficient evidence of guilt, (2) the methamphetamine evidence should have

been suppressed because it was seized in violation of his Fourth Amendment rights, and (3) he was denied due process because the government was responsible for the destruction of or failure to preserve potentially exculpatory video recorded at the terminal.

### A.    Sufficiency of evidence

We review de novo the sufficiency of the evidence, viewing all evidence and any reasonable inferences drawn therefrom in the light most favorable to the conviction. *See United States v. Christy*, 916 F.3d 814, 843 (10th Cir. 2019). "We will reverse a conviction for insufficient evidence only when no reasonable jury could find the defendant guilty beyond a reasonable doubt." *Id*. at 843. "To support a conviction of possession of [an unlawful drug] with intent to distribute in violation of 21 U.S.C. § 841(a)(1), the evidence must prove beyond a reasonable doubt the following elements: (1) the defendant knowingly possessed the illegal drug; and (2) the defendant possessed the drug with the specific intent to distribute it." *United States v. Reece*, 86 F.3d 994, 996 (10th Cir. 1996) (internal quotation marks omitted). Since Mr. Fernandez does not challenge the sufficiency of the evidence to support the intent-to-distribute element, we address only possession. *See, e.g.*, *Christy*, 916 F.3d at 844–53 (analyzing only whether sufficient evidence supported mens rea element of money-laundering offense when defendant did not contest whether government proved other elements).

The evidence of possession was strong. When the black duffel bag containing methamphetamine was in front of him, Mr. Fernandez said, "Yeah, that's my bag,"

7

and he asked Agent Perry, "You want to check it out?" R., Vol. IV at 1091. Moreover, the bag contained medical paperwork bearing Mr. Fernandez's name and a distinctive black hat that Agent Perry recognized as the one that Mr. Fernandez had worn three days before his arrest. The jury also heard circumstantial evidence suggesting consciousness of guilt: Mr. Fernandez was traveling with a name that bears little resemblance to his real name; he seemed concerned when he first saw the DEA agents on the bus; he constantly looked at Agent Perry to observe his interactions with other passengers; and he physically distanced himself from the bag containing methamphetamine by sitting several rows away from it, even though there were few passengers or bags on the bus.

Mr. Fernandez argues that the incriminatory evidence was not credible. He points to his daughter's trial testimony that his English is poor and argues that his purported admission of ownership resulted from his poor grasp of English; he explains that he regularly uses the name "Frank Dreke," which derives from a common nickname for his middle name, Francisco, and his grandmother's last name, Dreke; he doubts that Agent Lemmon, having never met him before, could recognize surprise or panic in his facial expressions; and he suggests that Agent Perry lied about finding his medical paperwork and the black hat in the bag. But it is the jury's duty, not ours, to weigh conflicting evidence and judge witness credibility. *See, e.g.*, *United States v. Brooks*, 438 F.3d 1231, 1236 (10th Cir. 2006). A reasonable juror could have credited the incriminatory evidence and found guilt beyond a reasonable doubt.

Mr. Fernandez also contends that Agent Perry's testimony that he recognized the black hat as Mr. Fernandez's should not be considered because the testimony violated an order in limine.[1] But "when considering a challenge to the sufficiency of the evidence, we consider all evidence admitted at trial, even if admitted improperly." *Davis v. Workman*, 695 F.3d 1060, 1078–79 (10th Cir. 2012).

### B.    Fourth Amendment claims

Mr. Fernandez contends that the district court erred in denying his motion to suppress the evidence found in the black duffel bag. He challenges as unlawful two different interactions with the bag: the agents' handling of the bag both before the passengers reboarded the bus and after they had reboarded. This unlawfulness, he argues, tainted his consent to the search of the bag, rendering it legally ineffective. *See United States v. Shrum*, 908 F.3d 1219, 1233–40 (10th Cir. 2018) (suppressing contraband found during search of house because defendant's consent to search the house was tainted by earlier unlawful securing (that is, seizure) of house by police).

### 1.    First alleged violation

After the bus had been serviced but before it was boarded by passengers, the DEA agents entered it to look for suspicious luggage. They noted the black duffel bag on the bus's overhead rack and removed it from the rack. The district court said that the handling of the bag did not exceed what "a commercial bus passenger would reasonably expect" because neither agent "squeezed" or "manipulated" the bag. R.,

---

[1] Mr. Fernandez does not separately seek reversal on the ground that the evidence was erroneously admitted.

Vol. I at 235. On appeal Mr. Fernandez focuses on the testimony by the officers that they held the bag for about 30 seconds, and he argues that their handling of it for that long a period of time constituted an illegal search even if the agents did not squeeze or manipulate the bag. This unlawfulness, he argues, requires suppression of the evidence later discovered in the bag. The government contends that any suppression argument based on the duration of lifting has been waived because it was not raised in district court. We agree with the government.

A defendant must raise a motion to suppress evidence before trial unless there is good cause for the delay. *See* Fed. R. Crim. P. 12(b)(3)(C), (c)(3). Absent such good cause, the issue is waived. *See United States v. Burke*, 633 F.3d 984, 988 (10th Cir. 2011) (plain-error review on appeal is unavailable for waived motions to suppress); *United States v. Bowline*, 917 F.3d 1227, 1236 (10th Cir. 2019) ("Because the 2014 amendments [to Rule 12] did not change the standard for appellate review, *Burke* remains good law."), *cert. denied*, 140 S. Ct. 1129 (2020). "This waiver rule applies not only when a defendant fails to file any pretrial motion to suppress, but also when a defendant fails to assert a particular argument in a pretrial suppression motion that he did file." *United States v. White*, 584 F.3d 935, 948 (10th Cir. 2009).

Mr. Fernandez has not argued that he had good cause for failing to raise the lifting-duration issue in district court. We therefore address only his argument that it was adequately raised below.

Before filing his district-court brief in support of his motion to suppress, Mr. Fernandez had been provided the police report stating that the DEA agents had lifted

10

the black duffel bag while the passengers were not on the bus. Yet the brief

challenged only Agent Perry's "act of grabbing his bag and carrying it up and down

the aisle of the bus" once the passengers had reboarded. R., Vol. I at 42.

Mr. Fernandez contends that the lifting-duration issue was raised at the hearing

on the motion to suppress, but we are not persuaded. He points to a discussion at the

hearing after presentation of the evidence. Before the closing argument the district

court asked defense counsel to "address the question of how what Agent Perry did

exceeds the scope of a permissible handling of bags." R., Vol. IV at 396. When

counsel turned to that question, he said the following:

> Now, what does handle mean? The testimony would suggest all [the
> DEA agents] did was lift [the bag] up and feel its heft, is I think the
> phrasing that Agent Lemmon had. I can't say that they squeezed it.
> They deny squeezing it. Agent Perry concedes he may have sniffed it or
> smelled it. He doesn't remember, he states.

*Id.* at 405. But counsel did not suggest that the agents' testimony indicated any

illegality. And when the district court again brought up how the bag was handled,

counsel's response was definitive:

> THE COURT: The direct testimony by both is that he did not
> manipulate the bag or squeeze it.
>
> [DEFENSE COUNSEL]: I understand. I understand that's their
> testimony.
>
> THE COURT: Well, *let me ask you where they went over the limits in
> the manner that they handled the—that Agent Perry handled the bag*.
>
> [DEFENSE COUNSEL]: I think the moment occurs *when he's on board
> and passengers are in their seats*. He's already conducted encounters
> with the passengers, and he's going to go get that bag. At that moment
> in time, that's an interference with the owner of the bag. That's owner's
> possessory interest.

11

*Id.* at 406–07 (emphases added). Counsel failed to make an issue of how the bag was handled before passengers reboarded.

Nor was the issue raised in Mr. Fernandez's motion for reconsideration after the motion to suppress was denied. Although the motion summarizes facts relevant to the lifting-duration argument, it does not derive any argument from these facts. Fairly read, the motion sought reconsideration based on recently obtained evidence suggesting that Agent Perry "pre-searched" bags left on buses during layovers and that the agent therefore had committed perjury at the suppression hearing in describing how he had handled Mr. Fernandez's bag before the passengers reboarded. R., Vol. I at 618–20. The motion requested that the suppression evidentiary hearing be reopened to explore the matter. There was no hint of an argument that even if the bag was not squeezed or manipulated by the agents, there was nevertheless a Fourth Amendment violation because of the time it was in their hands.

Finally, Mr. Fernandez argues that the lifting-duration issue was preserved even if he did not raise it, because it was "passed upon" by the district court in its opinion. Reply Br. at 4 (internal quotation marks omitted). True, we sometimes reach issues that were not presented to the district court but were nevertheless addressed by that court. *See United States v. Hernandez-Rodriguez*, 352 F.3d 1325, 1328 (10th Cir. 2003). That, however, is not what happened here. In relevant part, the district court wrote the following in its order denying the motion to suppress:

> In this case, as in [*United States v. Nicholson*, 144 F.3d 632 (10th Cir. 1998)], SA Perry and SA Lemmon boarded the bus outside the wash bay area to look at bags passengers had left onboard. SA Perry testified that

12

he removed the Protégé bag from the overhead rack in an effort to locate a name tag, causing him to note the bag's heft as compared to its size. However, there is no evidence here that the agents squeezed or manipulated the bag, or pressed in the sides of the bag with their hands to determine its contents in the manner found to be a search in *Nicholson*. It is not unusual on a common carrier for other passengers to push, move, and even momentarily remove an item from a common luggage area, such as an overhead rack or compartment, in order to make room for their own carry-on bags. SA Perry's actions did not depart from the type of handling a commercial bus passenger would reasonably expect his baggage to be subjected to, and therefore did not constitute a search within the meaning of the Fourth Amendment.

R., Vol. I at 235–36. Nowhere in this passage did the district court address a lifting-duration argument. Although the district court held *generally* that the agents' handling of the bag did not run afoul of the Fourth Amendment, it did not *specifically* address the "particular argument," *White*, 584 F.3d at 948, that the agents crossed the line by lifting the bag for 30 seconds while the passengers were gone. There is no reason to believe that the court was even thinking about how long the agents held the bag, much less was considering whether that period of time was unconstitutionally excessive.

Thus, Mr. Fernandez's lifting-duration argument is waived, *see* Fed. R. Crim. P. 12(c)(3), and plain-error review of the issue (which, in any event, he did not adequately raise) is unavailable, *see Burke*, 633 F.3d at 988–91.

### 2.   *Second alleged violation*

According to Mr. Fernandez, when Agent Perry grabbed the black duffel bag off the overhead rack and carried it from passenger to passenger, the agent unlawfully seized the bag. But the district court ruled that Agent Perry's action could

13

not have violated Mr. Fernandez's Fourth Amendment rights because he had abandoned the bag.

"A warrantless search and seizure of abandoned property is not unreasonable under the Fourth Amendment." *United States v. Hernandez*, 7 F.3d 944, 947 (10th Cir. 1993). This court has said that "[a]bandonment occurs if either (1) the owner subjectively intended to relinquish ownership of the property or (2) the owner lacks an objectively reasonable expectation of privacy in the property." *United States v. Easley*, 911 F.3d 1074, 1083 (10th Cir. 2018). "[I]n order to satisfy the 'reasonableness' requirement of the Fourth Amendment, what is generally demanded of the many factual determinations that must regularly be made by agents of the government . . . is not that they always be correct, but that they always be reasonable." *Illinois v. Rodriguez*, 497 U.S. 177, 185 (1990); *cf. id.* at 188 ("As with other factual determinations bearing upon search and seizure, determination of consent to enter must be judged against an objective standard: would the facts available to the officer at the moment warrant a man of reasonable caution in the belief that the consenting party had authority over the premises?" (ellipsis and internal quotation marks omitted)). Thus, "[t]he question . . . is whether a reasonable officer in Agent Perry's position would have believed that [Mr. Fernandez] had relinquished any property interests [he] possessed in the [bag] based on [his] voluntary words and actions." *Easley*, 911 F.3d at 1083.

The district court ruled that "any subjective expectation of privacy that [Mr. Fernandez] might have had in the bag was not objectively reasonable under the

14

circumstances." R., Vol. I at 242. We review for clear error the district court's findings of historical fact underlying that ruling, but we review de novo whether, given those facts, it was reasonable for Agent Perry to believe that Mr. Fernandez had relinquished his interest in the bag. *See United States v. Juszczyk*, 844 F.3d 1213, 1214 (10th Cir. 2017).

We affirm the district court's ruling that Mr. Fernandez abandoned his bag. The court found that Mr. Fernandez "responded three times in English, clearly and unambiguously" to Agent Perry that he did not have any luggage with him. R., Vol. I at 240. In response to Mr. Fernandez's argument that his answers merely reflected his lack of fluency in English, the court said that "the evidence establishes that although [Mr. Fernandez] spoke with a thick accent, he understood and responded appropriately to [Agent] Perry's questions." *Id.* at 241. And there was further evidence that Mr. Fernandez was trying to disassociate himself from the bag. The court noted that "the bus was not crowded, yet the bag was located several rows behind [Mr. Fernandez's] seat on the opposite side of the bus, indicating [his] subjective intent to distance himself from the bag." *Id.* at 241. The court's findings are not clearly erroneous. And given those findings, it was reasonable for Agent Perry to conclude that Mr. Fernandez had abandoned any rights he had in the bag before Agent Perry removed it from the rack and carried it up the aisle.

Mr. Fernandez contends that abandonment could not be inferred since he was not asked specifically about the bag containing methamphetamine. But Agent Perry had asked, "Okay, do you have luggage, do you have luggage on the bus with us?"

15

Suppl. R., Vol. I at 46. And Mr. Fernandez responded, "No, not (inaudible) I don't got nothing with me today." *Id.* To confirm the answer, Agent Perry asked again, "Do you have luggage with you?" *Id.* And Mr. Fernandez answered again, "No." *Id.* Then, after asking about luggage on Mr. Fernandez's prior trip, Agent Perry asked, "Ok, so you don't have any luggage?" and Mr. Fernandez answered, "Nah." *Id.* The import of Mr. Fernandez's answers was clear. We do not require law-enforcement officers to adopt speculative, contorted meanings of what suspects say. When Mr. Fernandez said that he did not have *any* luggage, it was more than reasonable for Agent Perry to infer that there was no luggage on the bus being claimed by Mr. Fernandez.

Mr. Fernandez argues that *United States v. Garzon*, 119 F.3d 1446 (10th Cir. 1997), supports his argument that Agent Perry had to ask him about a specific item before it could be deemed abandoned. We disagree. In *Garzon*, law-enforcement officers ordered passengers on a bus to disembark with their personal belongings and walk by drug-sniffing dogs. *See id.* at 1450. The defendant left without taking two of his backpacks. *See id.* When the officers found the backpacks still on board, they searched them without a warrant and found contraband. *See id.* at 1448. Opposing a motion to suppress, the government argued that the warrantless search was reasonable because the defendant had abandoned the backpacks by leaving them on board despite the officers' order to remove all personal belongings from the bus. *See id.* at 1449. We rejected the argument, holding that the officers' order that the passengers remove their belongings from the bus was illegal under the Fourth Amendment and defendant's abandonment could not be premised on such an

16

unconstitutional order. *See id*. at 1452–53. Our holding was not based on the officers' failure to ask about a specific item. Nothing in *Garzon* compels reversal of the district court's ruling on abandonment. Mr. Fernandez also directs us to cases in which the law-enforcement officers did in fact ask the suspect whether a specific item was his, but none of these cases said that such a specific inquiry was necessary to support a finding of abandonment.

### C.    Agency

Before trial Mr. Fernandez subpoenaed from Greyhound all video footage recorded from the surveillance cameras at the Albuquerque bus station on the morning he was arrested. But Greyhound responded with recordings from only a few of the cameras. Mr. Fernandez moved for an order requiring Greyhound to show cause why it should not be held in contempt and requested an evidentiary hearing to determine whether Greyhound was acting as an agent of the DEA in destroying or failing to preserve potentially exculpatory evidence. After an evidentiary hearing the district court ruled that Greyhound was not acting as an agent of the DEA with respect to the video recordings and denied a request by Mr. Fernandez for further in camera proceedings.

On appeal Mr. Fernandez asks us to reverse the agency ruling. Although his opening brief does not state what his endgame is or even cite the relevant Supreme Court authority, our understanding is that he would ultimately seek relief (perhaps including dismissal of the charges) on the ground that destruction of the video recordings by an agent of the government denied him due process. Under *California*

17

*v. Trombetta*, 467 U.S. 479, 488–89 (1984), the government may violate a defendant's due-process rights if it fails to preserve evidence whose exculpatory value was apparent before destruction of the evidence when "the defendant would be unable to obtain comparable evidence by other reasonably available means"; and *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988), held that the government may violate a defendant's due-process rights if it destroys in bad faith "potentially useful evidence" whose actual exculpatory value is unknown.

We question whether Mr. Fernandez has made an adequate showing under *Trombetta* or *Youngblood* that the unproduced videos had exculpatory value that was apparent before they were destroyed (or simply not recorded) or that anyone acted in bad faith in destroying or failing to preserve videos. But we need not resolve those issues because the district court did not commit reversible error in determining that Greyhound was not acting as an agent of the DEA with respect to the failure to preserve video recordings.

### 1.    Background

An extended account of the relevant proceedings will be helpful.

Before trial, on November 21, 2017, Mr. Fernandez's counsel sent a letter to Greyhound asking that it preserve all video and audio recordings from its Albuquerque bus station from 8 a.m. to 1 p.m. on October 25, 2017. On December 28 Greyhound received a subpoena duces tecum for such recordings, except that the time span was reduced to only 9:55 to 11:15 a.m. In response, however, Greyhound produced footage from fewer than all its cameras. Of particular concern to Mr.

18

Fernandez, there was no footage from cameras inside the terminal or at the maintenance bay, despite Greyhound's acknowledgement that it operated cameras in those areas. He was also suspicious because some of the video footage that was produced was stored on DVDs labeled as "Official Use Only" DEA discs.

Mr. Fernandez moved the district court to order Greyhound to show cause why it should not be held in contempt for disobeying the subpoena and to hold an evidentiary hearing to examine what happened. In addition, the motion sought to attribute to the government Greyhound's alleged shortcomings in responding to the subpoena, suggesting that Greyhound was acting as an agent of the DEA.

The district court conducted an evidentiary hearing, which lasted almost five hours. Five witnesses testified—two were Greyhound employees, one was an investigator employed by the public defender, and two were DEA agents.

The testimony of the DEA agents was constrained by instructions in a letter from Kyle Williamson, Special Agent in Charge of the DEA El Paso Division. The letter was referred to during the proceedings as a *Touhy* letter, referencing the Supreme Court decision in *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951), which held that the Attorney General could forbid subordinates from disclosing Department of Justice records in court without permission from the Attorney General. Mr. Williamson had sent the letter to defense counsel after several Albuquerque-based DEA agents were subpoenaed to testify at the hearing. He said that he was acting in accordance with Department of Justice (DOJ) regulations after consultation with the United States Attorney's office. The letter's purpose was to

19

ensure that the testifying DEA agents would not reveal privileged information, such as information about confidential sources or investigative techniques. *See* 28 C.F.R. § 16.23 (DOJ general disclosure authority in federal proceedings in which United States is a party); *id*. § 16.26(b), (c) (DOJ will not approve disclosures that "would reveal a confidential source or informant" or "disclose investigative techniques and procedures the effectiveness of which would thereby be impaired" unless "the administration of justice requires disclosure"); *Gaines v. Hess*, 662 F.2d 1364, 1367 (10th Cir. 1981) (addressing informant privilege); *United States v. Winner*, 641 F.2d 825, 831 (10th Cir. 1981) (addressing law-enforcement investigative privilege).

The *Touhy* letter authorized the agents to testify regarding (1) "their formal education, qualifications, training, and experience"; (2) "the facts and circumstances of their encounter with, and the arrest of, Juan [sic] Francisco-Fernandez at Greyhound's Albuquerque Station on October 25, 2017"; and (3) "their interaction, and any arrangements or agreements, with Greyhound employees at Greyhound's Albuquerque Station, including Greyhound's City Manager and Security Operations Manager, regarding the recording, preservation and/or production of video evidence." Suppl. R., Vol. III, Aplee. Ex. 1. The third category included "the witnesses' knowledge of DEA's procedures for obtaining video from Greyhound's Albuquerque Station, their knowledge or any use of the station's surveillance system, and their knowledge regarding the use of any DEA discs by Greyhound employees in Albuquerque for the purpose of recording video." *Id.* But the letter said that the DEA agents were not authorized to testify about anything that would "reveal classified

20

information," "reveal a confidential source or informant," or "interfere with enforcement proceedings or disclose investigative techniques and procedures, the effectiveness of which would thereby be impaired." *Id.* The *Touhy* letter is reproduced in the Appendix to this opinion.

Greyhound's recording, preservation, and production of video-surveillance footage were explored at length before and during the hearing. An affidavit from Marie Avila, a former Greyhound manager who had handled Mr. Fernandez's pre-subpoena preservation request, was attached to Greyhound's response to his motion for order to show cause. It discussed in general terms the locations of the bus station's 52 motion-activated cameras, the use of four digital video recorders to collect footage from the cameras, and the process for preserving video from those cameras and recorders. The affidavit stated that Ms. Avila had been unable to download footage from four cameras near the maintenance bay because of technical problems with the cameras and recording equipment.

At the hearing, defense counsel questioned both Ms. Avila and David Streiff, Greyhound's security operations manager for North America. Ms. Avila confirmed that Greyhound's response to the subpoena was incomplete because its camera and video-recording equipment were malfunctioning. She and Streiff testified, however, that the DEA had never directed or suggested how to handle defense attorneys' preservation requests or subpoenas. Ms. Avila also said that the DEA had never provided funds or influenced in any way the conduct of security operations at the Albuquerque terminal. Mr. Streiff stated that a password was necessary to download

21

video from the digital-video recorders, and this task would be performed by the terminal manager or her designee; and he said that he was unaware of any training of Greyhound personnel by anyone associated with the DEA.

Agent Perry and DEA Agent Jeffrey Armijo, a group supervisor in the Albuquerque district office, also testified. They said that they had not known that Mr. Fernandez had requested anything from Greyhound; that they had never advised Ms. Avila on how to respond to preservation requests or subpoenas; and that they had nothing to do with Greyhound's video-surveillance, recording, or preservation protocols. Regarding the "Official Use Only" DEA discs, Agent Perry testified that he had once given 100 blank DEA discs to Greyhound as a courtesy—Greyhound had run out of DVDs to fulfill a DEA video request, so Agent Perry gave Greyhound a spindle of DEA discs. (Ms. Avila testified that she had not used any of the DEA discs to make copies of surveillance videos for Agent Perry but had used them on other occasions, as when there was an accidental stabbing or a slip-and-fall case at the terminal.)

One occasion explored by defense counsel was an April 2017 meeting of Ms. Avila, Mr. Streiff, Agent Armijo, and Agent Perry. On March 30, Mr. Streiff had emailed Ms. Avila, asking her to set up a meeting with the DEA agent assigned to the Albuquerque bus station and his supervisor. One line in the email read, "I need to meet with him to discuss these defendants attorneys' requests for video and information and . . . what are [sic] future response will be. We want to ensure continued partnership with them, but we need to go over some understandings with

22

them." R., Vol. IV at 96. At the hearing, Mr. Streiff explained why he worded his email to Ms. Avila that way:

> I was referencing the numerous subpoenas that we were receiving in Albuquerque. The number of subpoenas in Albuquerque far outweighed any other location within the United States, so therefore, we felt that by streamlining the areas that any law enforcement agency would operate in our terminal would assist us in being able to more accurately and readily respond to subpoenas.

*Id.* at 121–22. Mr. Streiff further testified that "the entire focus of the meeting" was where DEA agents "can and cannot operate" within the Greyhound terminal. *Id.* at 123. For his part, Agent Perry considered the meeting something like a "meet and greet." *Id.* at 185.

Regarding subpoenas, Agent Perry and Agent Armijo recalled Mr. Streiff saying that if the DEA wanted to subpoena Greyhound, the subpoena should be sent directly to him. Also, Mr. Streiff testified that as he and Ms. Avila were leaving the meeting, the two discussed, almost as an afterthought, how to handle defense attorneys' preservation requests and subpoenas going forward. He told her that she did not need to immediately respond to preservation requests and subpoenas that did not come from Greyhound's corporate offices and that she should forward them to corporate counsel before taking any action. But none of the four meeting participants recalled any discussion of how Greyhound should respond to defense attorneys' attempts to obtain video footage other than the conversation between Ms. Avila and Mr. Streiff; and if the DEA agents were even within hearing range of this brief conversation, they said nothing.

23

No *Touhy*-related objection was posed to any of defense counsel's questions to Greyhound or DEA employees relating in any way to the video surveillance.

Defense counsel also asked about the relationship between DEA agents and personnel at the Greyhound terminal. He extensively questioned the Greyhound employees and DEA agents about the agents' access to Greyhound's facilities. According to Ms. Avila, law-enforcement officers like Agent Perry had Greyhound's permission to enter parts of the Albuquerque terminal not usually accessible to the public, including the warehouse, the maintenance bay, and the employee break room. Except in the maintenance bay, where officers were to be accompanied by the maintenance bay's manager,[2] Greyhound policy allowed officers to move through Greyhound's facilities relatively freely, although they would almost always be in view of some Greyhound employee. Asked by defense counsel about his use of Greyhound computers, Agent Perry testified that, aside from checking his email on a Greyhound employee's computer, he did not have access to Greyhound computers. Ms. Avila described her relationship with Agent Perry as a friendly professional relationship. She sometimes saw him in the bus terminal, and they sometimes chatted

---

[2] Greyhound policy on law-enforcement officers' access to the maintenance bay apparently changed at some point, and defense counsel questioned the witnesses about this policy change. Agent Perry testified that he believed for a time that he had permission to enter the maintenance bay unescorted, but then Ms. Avila told him he needed an escort so, to avoid any problems, he has stopped entering that area altogether, escorted or not.

24

in her office. The two had even exchanged small gifts for Christmas.[3] Ms. Avila

testified, however, that she was not a DEA informant, nor, to her knowledge, was any

other Greyhound employee. Also, defense counsel asked Mr. Streiff why he had

characterized the Greyhound-DEA relationship as a "partnership" in his email to Ms.

Avila to set up the meeting with Agents Armijo and Perry. R., Vol. IV at 123. Mr.

Streiff responded that the relationship was a "community outreach partnership, no

more different than any other agency asking to participate in our terminal such as the

Salvation Army dealing with the homeless, an NGO, or local law enforcement . . . ."

*Id.* at 123–24.

Of particular interest to defense counsel was Agent Perry's access to passenger

manifests, which contain information on the passengers on each bus. Greyhound

drivers, ticket agents, terminal managers, various supervisors, and the company's

legal department all have access to passenger manifests. Greyhound policy prohibited

any employee from sharing this information outside the company without a

supervisor's permission. But despite the policy Agent Perry testified that he obtains

Greyhound passenger manifests.

During the hearing the government objected only three times on grounds raised

by the *Touhy* letter to questions posed by defense counsel. Each objection was during

cross-examination of Agent Perry. First, the government objected when Agent Perry

---

[3] Agent Perry gave the gifts, such as DEA coins or patches, to other
Greyhound employees as well. Ms. Avila may have given him a Greyhound stuffed
dog.

was asked whether he had ever used the computer in a certain Greyhound employee's office; the district court overruled the objection, and Agent Perry answered that he had checked his email on that computer. Second, the government objected when Agent Perry was asked whether he pays to get Greyhound's passenger manifests;[4] the district court sustained the objection, deciding that the question implicated investigative techniques. Third, the government objected when Agent Perry was asked whether he used confidential informants at Greyhound; this time, the court did not resolve the objection and instead ordered briefing on the effect of the *Touhy* letter on the admissibility of evidence. Defense counsel then said that he would "avoid the questions that would draw objections with the understanding that perhaps, if we need to go in camera, we can do that." R., Vol. IV at 209. After a few more questions on cross-examination, the hearing concluded.

In his brief to the district court on the privilege issue, Mr. Fernandez listed a number of areas of inquiry that he was allegedly prevented from pursuing at the hearing because of the government's objections based on the *Touhy* letter. But he had pursued, without objection from the government, most of these subjects at the hearing. And, more importantly, aside from the issue of whether Agent Perry paid for passenger manifests, he has failed to provide any reason (much less a sound reason) for thinking that he would have been restricted in pursuing any of the listed areas,

---

[4] Defense counsel knew that Agent Perry had testified in a prior case that he had paid a Greyhound employee for information from a passenger manifest. *See United States v. McKenzie*, 779 F. Supp. 2d 1246, 1252 (D.N.M. 2011), *aff'd*, 532 F. App'x 793 (10th Cir. 2013).

other than those relating to Agent Perry's access to the manifests and use of informants. In particular, he has provided no excuse for failing to pursue any additional questions he may have had concerning the surveillance cameras and video recordings; and a plausible excuse seems highly unlikely since the *Touhy* letter explicitly approves such questioning and the government had posed no objections to any of defense counsel's questions on the subject.

After reviewing the briefs and the evidence, the district court ruled that there was no agency relationship between the DEA and Greyhound. *See* R., Vol. I at 222 ("Defendant has failed to establish that Greyhound or Ms. Avila acted as agents of the DEA. Accordingly, any failure by Greyhound or Ms. Avila to properly preserve videotape cannot be attributed to the government."). The court declined to hear further testimony in camera about Agent Perry's relationship with a confidential informant employed by Greyhound, finding that any such testimony would be irrelevant to the agency issue.

### 2.    *Analysis*

On appeal Mr. Fernandez challenges both the district court's conclusion on agency and its refusal to hold an in camera hearing before reaching that conclusion.

The defendant bears the burden of proving a *Trombetta-Youngblood* violation. *See United States v. Beckstead*, 500 F.3d 1154, 1158 (10th Cir. 2007). This circuit has twice suggested that a due-process violation under *Trombetta* or *Youngblood* can be predicated on conduct by a nongovernmental actor on the ground that the actor was an agent of the government. *See Beckstead*, 500 F.3d at 1158 n.3 (private

27

company specializing in cleaning crime scenes was state agent for purposes of defendant's *Trombetta-Youngblood* theory); *Bullock v. Carver*, 297 F.3d 1036, 1055–57 (10th Cir. 2002) (therapist was not state agent, so *Trombetta-Youngblood* theory could not be premised on her acts). In *Beckstead* we said only that we would treat the action of the private company as government action because the "company's employees . . . acted only at the specific direction of police officers." 500 F.3d at 1158 n.3. In *Bullock* we held that a child therapist who had destroyed the notes of her interviews with the defendant's victims was not an agent of the government even though most of her employer's financing came from a state agency. We noted (1) that the employer "was privately run and depended upon funding sources besides the state contract," (2) that the employer "developed and implemented its own practices and procedures without . . . direction from the state or the police," and (3) that the police had not "condoned" the therapist's failure to record her interviews. *Bullock*, 297 F.3d at 1057. Neither opinion attempted to establish a comprehensive test for determining agency in the *Trombetta-Youngblood* context.

It may be tempting simply to apply the common-law principles of agency, as expressed in the Restatements or civil caselaw; and certainly that doctrine can be informative, *see United States v. Ackerman*, 831 F.3d 1292, 1301 (10th Cir. 2016) (Gorsuch, J.) (referencing common-law doctrine in determining that private party was government agent in Fourth Amendment context). But the factors that drive the determination of whether the government is bound by private action in the criminal context may be rather different from those that are most relevant to determine

28

whether a principal is liable under tort or contract law for the actions of an agent. As just one example, under common-law agency principles the agency relationship is a voluntary one. *See* Restatement (Third) of Agency § 1.01 & cmt. c. But a defendant could surely prevail on a suppression motion based on a search by a private person who was coerced by law-enforcement agents into conducting the search.

Not only is the concept of agent in the criminal-law context not entirely controlled by common-law doctrine, but the concept may even depend on the constitutional right at stake. We recognized this proposition in *United States v. Alexander*, 447 F.3d 1290 (10th Cir. 2006), where we considered whether a defendant's Fifth Amendment rights were violated when a private person allegedly acting as an agent of the government questioned the defendant. We summarized our precedent for determining "whether a search by a private person should be classified as a government search" and then stated that "[w]hile this framework has not been explicitly adopted in the Fifth Amendment context, it is nonetheless instructive." *Id.* at 1295.

As in our prior opinions on the subject, we can resolve the agency issue in this case without setting forth a comprehensive framework for determining when the intentional or negligent loss of evidence by a private person is attributable to the government under *Trombetta* or *Youngblood*.

To begin with, there is no evidence that the DEA had any contact with Greyhound regarding how to respond to defense counsel's request for preservation or the subpoena; on the contrary, the uncontradicted testimony was that the DEA agents

29

did not even know of the request or the subpoena before Greyhound responded to the subpoena. Further, there is no evidence that the DEA had *ever* communicated with Greyhound regarding how to respond to such requests, much less evidence that Greyhound had trained or advised Greyhound personnel on the matter. Nor was there any evidence that the DEA had ever communicated with Greyhound regarding where to place cameras, how to record what the cameras detected, or how to preserve video recordings. The only relevant contact between Greyhound and the DEA regarding the general operation of the surveillance system was that Agent Perry had provided 100 blank discs when a Greyhound employee had said that the terminal was out of discs on which to download a video requested by the DEA. There was no evidence that any condition was placed on the use of the discs; on the contrary, Ms. Avila testified that she had never provided a disc to the DEA but had used the discs on several occasions to download videos of noncriminal incidents. In any event, the only purpose that could be served by supplying discs to Greyhound would be to facilitate its *preservation* of information; it would be bizarre to use this act as a ground for holding the DEA responsible for Greyhound's *failure to preserve* information for Mr. Fernandez.

Mr. Fernandez complains that the government's invocation of the informant privilege prevented him from establishing an agency relationship between the DEA and Greyhound. To be sure, an informant who provides manifests *could* be acting as an agent of the DEA. But the only issue before the court was whether someone at Greyhound was acting as an agent of the DEA *in not producing the video footage*

30

sought by Mr. Fernandez. And Mr. Fernandez had no reason to believe that he would be restricted in any way from asking whether a Greyhound employee (whether or not an informant) was acting under some direction from the DEA regarding the video surveillance and the preservation of recordings. Indeed, defense counsel asked multiple questions on the topic.[5]

Perhaps the defense theory was that all that was necessary to hold the DEA responsible for Greyhound's failure to preserve the requested recordings was to show that Greyhound had acted as an agent of the DEA for *some* purpose. But this theory misconceives the concept of agent. The existence of an agency relationship between the government and a person with respect to one matter does not make that person an agent for all other matters. This is a fundamental proposition of common-law agency. As stated in Restatement (Third) of Agency § 1.01 cmt. c:

> Despite their agency relationship, a principal and an agent retain separate legal personalities. Agency does not merge a principal's personality into that of the agent, nor is an agent, as an autonomous person or organization with distinct legal personality, merged into the principal. The fact that an agent acts on behalf of, or represents, another person implies the existence of limits on the scope of the agency relationship and on the extent to which the principal is accountable for the agent's acts. *The metaphor of identification, which merges an agent's distinct identity with the principal's, is potentially misleading and not helpful as a starting point for analysis.*

---

[5] When defense counsel was questioning Agent Perry about his informant, he may have been pursuing a theory that the informant himself or herself had something to do with the video recordings. But nothing in the questions suggested that approach, defense counsel never tried to justify his questions on that ground, and we can see no reason why such a roundabout approach would be necessary.

31

(emphasis added). Roughly speaking, a principal is liable for the tortious conduct of the agent only if the conduct was tied to the subject matter of the agency. *See Alfaro-Huitron v. Cervantes Agribusiness*, 982 F.3d 1242, 1252 (10th Cir. 2020); Restatement (Third) of Agency § 7.04 ("A principal is subject to liability to a third party harmed by an agent's conduct when the agent's conduct is within the scope of the agent's actual authority or ratified by the principal . . . ."); *id.* § 7.07(1) ("An employer is subject to vicarious liability for torts committed by its employee acting within the scope of employment.").

We see no justification for departing from this proposition in the due-process context. The touchstone of due process is "prevailing notions of fundamental fairness." *Trombetta*, 467 U.S. at 485. That is, the defendant is entitled to relief when the government's conduct is fundamentally unfair. *Fundamental* unfairness is presumably a higher bar than the notions of fairness that govern the common law, which determines when it is fair to hold a person liable in contract or tort. We conclude that when common-law agency doctrine would not hold the government responsible for the conduct of a purported agent, ordinarily the government also would not be held responsible for the alleged agent's acts under the *Trombetta-Youngblood* doctrine.

On occasion there may arise difficult questions concerning the scope of an agent's authority and whether fundamental fairness requires that the government be held responsible for conduct by an agent who acts beyond what is expressly authorized by the government. But this is not a close case. Nothing before us raises a

32

substantial challenge to the testimony at the district-court hearing that the DEA simply had nothing to do with how Greyhound operated or maintained its system of video surveillance, including its recording and preservation of videos. We cannot read *Trombetta* or *Youngblood* as supporting a notion of fundamental fairness that would require the government to be held responsible for whatever caused Greyhound not to be able to provide Mr. Fernandez with the recordings he requested.

Mr. Fernandez suggests that it was enough that Greyhound and the DEA shared a common goal—reducing the use of Greyhound buses for crime. But sharing a common goal does not transform an independent actor into an agent. *See Alexander*, 447 F.3d at 1296 (inmate friend volunteered to convince defendant to confess; government agreed to let friend try; although government "hoped [the friend] would be successful," friend's "purpose [a reduced sentence for defendant] was completely divorced from [government's] hope"); *United States v. Leffall*, 82 F.3d 343, 346–47, 349 (10th Cir. 1996) (airline employee who "personally and independently made the decision to open the package because he felt it contained some type of contraband or something illegal" was not motivated to act on behalf of the government, even though police officer watched and did not object). In any event, a common goal of generally preventing crime says little about the specific agency issue in this case—whether Greyhound acted as the government's agent *when Greyhound failed to preserve potentially exculpatory video evidence*.

Finally, Mr. Fernandez has no legitimate complaint about the district court's refusal to conduct an in camera hearing. To prevail on the agency issue he needed to

33

establish ties between the DEA and Greyhound with respect to the surveillance system and the recording and preservation of video surveillance. But, as previously noted, he was not restricted in any way from developing such evidence during the evidentiary hearing already conducted.

The district court did not err in finding that Greyhound was not acting as an agent of the DEA with respect to the preservation and production of surveillance video or, in particular, in its response to Mr. Fernandez's preservation request and subpoena.

## III. CONCLUSION

We **AFFIRM** Mr. Fernandez's conviction.

**APPENDIX**

Dear [Defense Counsel]:

This letter is in reference to your subpoenas for the testimony of Drug Enforcement Administration (DEA) Special Agents (SAs) Jeff Armijo, Kirk Lemmon and Jarrell Perry at a show cause hearing before the Honorable James A. Parker on June 19, 2018, at 1:00 p.m. We also are in receipt of your letter dated May 15, 2018, providing a summary of the testimony sought.

As you know, the disclosure of official information by the DEA and its employees is governed by applicable Department of Justice regulations, 28 CFR §§ 16.21 to 16.29 (known as the *Touhy* regulations). Pursuant to these regulations, we have reviewed the subpoenas and your letter. In consultation with the United States Attorney's Office for the District of New Mexico, we have considered the factors set forth in 28 CFR § 16.26, including applicable rules of procedure and relevant substantive law concerning privilege, in determining whether disclosure is appropriate in this instance.

Consequently, we authorize SAs Armijo, Lemmon and Perry to provide testimony relating to the following matters **only**:

1. their formal education, qualifications, training, and experience;
2. the facts and circumstances of their encounter with, and the arrest of, Juan Francisco-Fernandez at Greyhound's Albuquerque Station on October 25, 2017; and
3. their interaction, and any arrangements or agreements, with Greyhound employees at Greyhound's Albuquerque Station, including Greyhound's City Manager and Security Operations Manager, regarding the recording, preservation and/or production of video evidence. This includes the witnesses' knowledge of DEA's procedures for obtaining video from Greyhound's Albuquerque Station, their knowledge or any use of the station's surveillance system, and their knowledge regarding the use of any DEA discs by Greyhound employees in Albuquerque for the purpose of recording video.

In accordance with 28 CFR § 16.26(b), SAs Armijo, Lemmon and Perry are **not** authorized to testify about any matter, or otherwise make any disclosure, that would:

1. violate a statute, a rule of procedure, or a specific regulation;
2. reveal classified information;
3. reveal a confidential source or informant; or

4. interfere with enforcement proceedings or disclose investigative techniques and procedures, the effectiveness of which would thereby be impaired.

In particular, it is our position that, while questions relating to the witnesses' relations with employees at Greyhound's Albuquerque Station may be appropriate, any attempt to elicit testimony regarding the identity of, or payments or benefits to, any DEA confidential source or informant would not be appropriate. Nor would it be appropriate to attempt to elicit testimony regarding DEA's investigative techniques, procedures or policy relating to searches of public transportation. Such information relating to confidential sources or investigative techniques, if it exists, is privileged and not relevant to this proceeding under F.R.E. 401 nor material to preparing a defense under F.R.Cr.P. 16(a). More specifically, such information is not relevant or material to the questions of: (1) whether Greyhound was acting as an agent of the Government in the preservation or production of (or any failure to preserve or produce) video evidence in this case; (2) whether the Government knew of or acquiesced in Greyhound employees' actions in response to the Defendant's preservation request and subpoena to Greyhound in this case; or (3) whether any Greyhound employee who preserved or produced video evidence in this case did so intending to assist law enforcement efforts or to further his or her own ends.

We have instructed SAs Armijo, Lemmon and Perry that, if asked to testify about any matter beyond the scope of that for which they are authorized, they should respectfully decline to answer and explain that they are precluded from doing so. We note that a DEA employee may not be held in contempt for failing to produce information in response to a subpoena or other demand if the employee has not been authorized to make such a disclosure pursuant to the *Touhy* regulations. *See United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951).

If you have any questions, please contact Division Counsel Gregory Stevens at [redacted].

Sincerely,
Kyle W. Williamson
Special Agent in Charge

Suppl. R., Vol. III, Aplee. Ex. 1.